E-FILED
Thursday, 18 April, 2013  09:50:19 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **ALL STAR CHAMPIONSHIP RACING, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 11-CV-2160** |
| **v.** | ) ) | |
| **O'REILLY AUTOMOTIVE STORES, INC., d/b/a O'RELLY AUTO PARTS,** | ) ) ) ) | |
| **Defendant.** | ) ) | |

## OPINION

This case is before the court on Defendant O'Reilly Automotive Stores's ("Defendant")

Motion for Summary Judgment (#57) on its Amended Counterclaims (#26). The underlying case

is a contract dispute. While Plaintiff All Star Championship Racing's ("Plaintiff") claims are still

being litigated and are proceeding independently, Defendant has filed five counterclaims. The

present opinion adjudicates the Motion for Summary Judgment on those counterclaims. The

court has reviewed the briefs, exhibits, and prior filings in the docket. Following this careful

review, Defendant's Motion for Summary Judgment (#57) is GRANTED IN PART and

DENIED IN PART as to Counts 1, 2, 3, and 4; and DENIED as to Count 5.

## Jurisdiction

With respect to Counts 1 and 2 of Defendant's Counterclaims, this court has jurisdiction

pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338 as those claims arise under the Lanham Act,

15 U.S.C. § 1051-1141n. Regarding Counts 3, 4, and 5 of the Counterclaims, this court has

supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as those claims form part of the same

case or controversy as the Lanham Act claims. In addition, because Plaintiff is a corporation

incorporated under the laws of Illinois, with a principal place of business in Illinois, and

Defendant is a corporation incorporated under the laws of Missouri, with a principal place of

business in Missouri, and Defendant has alleged an excess of $75,000 in controversy in its notice

of removal (but Plaintiff's original claim was $66,000), this Court has diversity jurisdiction.

## Background

### Factual background

Magistrate Judge David G. Bernthal previously described the underlying factual

background in his Report and Recommendation (#58). Those facts will not be repeated here in

detail, but instead only those relevant to the counterclaims. Plaintiff organizes automobile races

and sells advertisement rights associated with those races. There are three series relevant here:

the All Star Circuit of Champions; the Midwest All Star Series; and the All Star Late Model

series. Defendant is a publicly-traded corporation that sells automobile parts with nearly 4,000

retail stores and over six billion dollars in sales in 2012.[1] Defendant registered four trademarks

(the "Marks"). These are (a) U.S. Trademark Registration Number 3,526,775, for a trademark

consisting of the word "O'Reilly" in stylized font with a shamrock positioned inside the "O"

("O'Reilly Mark"); (b) U.S. Trademark Registration Number 1,896,667, for a service mark

consisting of the words "O'Reilly Auto Parts" with the word "O'Reilly" in stylized font with a

---

[1] O'Reilly Corporate Annual Report, 2012,
http://corporate.oreillyauto.com/corporate/GetUpload?id=orly_pdf_98.pdf.

shamrock positioned inside the "O" ("O'Reilly Auto Parts Mark"); (c) U.S. Trademark

Registration Number 3,629,620, for a service mark consisting of the words "O'Reilly Racing"

for "promoting the ticket sales relating to the motor sports racing events of others" ("O'Reilly

Racing Mark"); and (d) U.S. Trademark Registration Number 3,422,750, for a service mark

consisting of the words "O'Reilly Auto Parts Professional Parts People" for "retail and on-line

retail stores featuring automobile parts and accessories" ("O'Reilly Auto Parts Professional Parts

People Mark.").

The parties do not contest that in 2006, Defendant purchased advertising rights from

Plaintiff's predecessor-in-interest for the 2007, 2008, and 2009 racing seasons for the All Star

Circuit of Champions (the "2007, 2008, and 2009 Agreement"), acquiring, among other things,

the right to display Defendant's Marks on its marketing, advertising, and other affiliated

materials. (Amended Counterclaim, #26 ¶ 15; Answer to Amended Counterclaim, #66 ¶ 15;

Motion for Summary Judgment, #57 exh. E). The parties also do not contest that in 2007, they

entered into a similar agreement for the 2008, 2009, and 2010 racing seasons for the Midwest All

Star series. (#26 ¶ 16; #66 ¶ 16; #57 exh. F). At some point in 2010, a dispute arose between the

parties regarding the formation and validity of a contract that would have renewed the

advertising rights for the 2010, 2011, and 2012 seasons for the All Star Circuit of Champions

(the "2010, 2011, and 2012 Agreement").

Both parties have a different presentment and interpretation of events and correspondence

occurring from late 2009 through the middle of 2011. In late 2009, Defendant sent Plaintiff a

copy of what it alleges was a draft of the 2010, 2011, and 2012 Agreement. (#57, exh. G). The

copy had several minor redlined corrections on it. Plaintiff signed it, dated it 1-4-010 [*sic*] (it

appears that 1-4-09 was written, then corrected to be 1-4-10), and returned it to Defendant.

Defendant avers that it never countersigned that contract, and indeed, the copies provided by both parties are not countersigned. There are other contested issues.

For example, Defendant alleges, but Plaintiff denies, the existence of an oral extension of the license to use the Marks to last through the 2010 season. (#26 ¶ 31; #66 ¶ 31). Plaintiff does admit the following facts: First, on or about November 2, 2010, Defendant's representative contacted Plaintiff and stated that Defendant had made a business decision to discontinue its relationship with Plaintiff and had decided to pursue relationships with other sponsorship partners. (#26 ¶ 39; #66 ¶ 39). Second, by the end of 2010, a written agreement had expired (although Plaintiff does not indicate *what* agreement) (Defendant's Requests for Admissions, #57 exh. X ¶ 10 and Plaintiff's Response to Defendant's Request for Admission, #27 ¶ 10; but compare the inconsistency in Plaintiff's answer in #26 ¶ 41 and #66 ¶ 41). Third, that it did not have specific permission or consent from Defendant to continue using Defendant's Marks after December 31, 2010. (#26 ¶¶ 47, 51 and #66 ¶¶ 47, 51). Fourth, between January 2011, and late June, 2011, that Defendant's Marks appeared on Plaintiff's website in numerous places. (#26 ¶¶ 45-46 and # 47 ¶¶ 45-46). Fifth, Plaintiff alleges, but Defendant denies, that Defendant supplied to Plaintiff promotional items to give away at the 2011 races, and that Defendant approved all promotional and advertising actions taken by Plaintiff during the 2010 racing season up until November 2011. (Amended Complaint, #56 ¶ 15; Answer to Amended Complaint, #70 ¶ 15). Finally, Plaintiff admits that it received a letter from Defendants dated July 1, 2011 indicating that it was Defendant's position that there is "no agreement currently in place" between Plaintiff and Defendant. (#66 exh. A). That letter further demanded that Plaintiff cease and desist any and all further usage of the Marks. Around July 16, 2011, Plaintiff admits that it published the following press release on its website:

> *All Star Championship Racing, Inc. ends relationship with O'Reilly Auto Parts* Camargo, IL (7-16-11) - All Star Championship Racing, Inc. has removed O'Reilly Auto Parts as the title sponsor for the All Star Circuit of Champions, All Star Late Model Series, and the Midwest All Star Series resulting from an unpaid invoice in January 2011, we are now moving forward with collection proceedings. Please note that all O'Reilly trademarked material have been removed from all logos, printed material, and social media from this date forward. We have enjoyed several years in working with O'Reilly Auto Parts in sponsoring our company, it is regretful the relationship has ended.

(#57 exh. X ¶ 45; #27 ¶ 45). Plaintiff admits that, despite posting that release, it had continued to use Defendant's Marks on signs at races it managed, on its website, and in photographs on its website showing race winners standing next to a sign with Defendant's Marks through August 22, 2011. (#57 exh. X ¶¶ 52-57, 59-61 and #27 ¶¶ 52-57, 59-61). Plaintiff also later admitted that it was using the Marks on its website was September 30, 2011. (#57 exh. X, ¶ 87; #27, ¶ 87). In an Opinion issued on September 30, 2011, this court noted that:

> On July 16, 2011, All Star posted a news update on its website which stated that the relationship with O'Reilly had ended and that it had removed all Marks from its website and promotional materials. However, All Star's website continued to have O'Reilly's Marks on its website and on promotional materials at races, which were captured in pictures posted on its website.
>
> [ * * *]
>
> Moreover, this court notes that in spite of All Star's continued statements that it has removed all references to O'Reilly, as of September 29, 2011, All Star's website, amazingly, still contains references to O'Reilly.

(#22 p.3 n.1). Plaintiff asserts that its failure to remove the Marks from its website was "simply an oversight". (#66 ¶ 46).

**Procedural posture**

On May 23, 2011, Plaintiff filed a complaint against Defendant in the Circuit Court of Douglas County in Illinois state court, alleging breach of contract. (#1 exh. A). On June 24, 2011, Defendant removed that case to this court. (#1). On July 1, 2011, Defendant filed a Motion to Dismiss (#6) and a series of counterclaims (#8). On August 24, 2011, Defendant filed a Motion for Preliminary Injunction (#12), which this court granted on September 30, 2011 (#22). On October 18, 2011, Defendant filed an Amended Counterclaim (#26). On November 1, 2011, Judge Bernthal entered his Report and Recommendations, recommending that the case be dismissed because Plaintiff alleged the breach of a contract that could not be performed within the span of one year and was not countersigned by Defendant, thereby making it unenforceable under the Illinois Statute of Frauds.  (#28). The Report and Recommendation was adopted (#34), and the complaint was dismissed with prejudice (#34).

On February 1, 2012, Plaintiff filed a Motion to Amend/Correct its complaint (#35), which was granted on March 15, 2012 (#42). An appeal (#43) was filed, which was denied (#47), permitting Plaintiff to file its Amended Complaint, which alleged one claim of fraud and one claim of recovery under a theory of quasi-contract (#48). Defendant filed a Motion to Dismiss the Amended Complaint (#49), which was granted on October 4, 2012, as to the allegation of fraud, but denied as to the allegation of recovery under quasi-contract, permitting the latter claim to proceed (#58). On January 14, 2013, this court accepted the order (#69).

Earlier, on October 1, 2012, Defendant filed its Motion for Summary Judgment. (#57). On November 14, 2012, Plaintiff filed its Response (#67), and Defendant filed its Reply on November 28, 2012 (#68). That Motion (#57) is the matter currently before the court.

**Analysis**

- 6 -

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)*.* In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). Defendant has asserted five counterclaims: 1) trademark infringement; 2) false designation of origin; 3) violation of the Illinois Uniform Deceptive Trade Practices Act; 4) Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; and 5) defamation.

As a preliminary matter, Plaintiff's Response (#67) to Defendant's Motion for Summary Judgment is wholly inadequate. Local Rule 7.1(D)(2)(b) requires a Response to state in separate subsections the undisputed material facts, disputed material facts, disputed immaterial facts, undisputed immaterial facts, and additional material facts. Each subsection must list by number each undisputed material fact from the motion for summary judgment and whether it is considered to be material and disputed. Even read liberally, Plaintiff's Response did not comply with Local Rule 7.1(D)(2)(b). Instead, the Response has a section called "Discussion of O'Reilly's Statement of Undisputed Facts" and fails to list each of Defendant's facts by number and respond to each numbered fact. Further, the "Discussion" section appears to engage in argument when it cites to Webster's Dictionary in support of the proposition that the word "use"

has a different legal meaning than what Defendant proposes it to mean. Finally, Plaintiff failed to comply with Local Rule 7.1(D)(2)(b)(5), which requires that any additional material facts must be numbered and supported by evidentiary documentation referenced by specific page. Local Rule 7.1(D)(2)(b)(6) requires that "[a] failure to respond to any numbered fact will be deemed an admission of the fact." Because Plaintiff has not complied with the local rules, this court is permitted to accept as true all of Defendant's facts for the purpose of the motion at bar. However, a party's failure to submit a proper response "does not lead directly and without more to the entry of summary judgment, but merely establishes the factual basis from which the [summary judgment] analysis will proceed." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 392 (7th Cir. 1995). It remains "movant's burden to demonstrate that no genuine issue of material fact exists and that he is entitled to summary judgment as a matter of law." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994). Where the evidence presented clearly contradicts the facts stated by Defendant, this court has drawn any and all inferences in favor of Plaintiff.

**Count 1: Trademark Infringement**

Defendant alleges that Plaintiff engaged in trademark infringement when it used Defendant's Marks without its consent, in violation of the Lanham Act, 15 U.S.C. § 1114. That statute reads, in pertinent part, as follows:

> Any person who shall, without the consent of the registrant—
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> >
> > (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels,

> signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

In order to prevail on a trademark infringement claim, a plaintiff must establish that (1) its mark is protectable; (2) the defendant's use of the mark is likely to cause confusion among consumers; and (3) the defendant's use of the mark is not authorized. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998) ("[I]n order to prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake.")

*Validity of the mark*

Regarding the first element, Plaintiff does not contest that the Marks are valid, nor does it contest that Defendant owns the Marks. (#26 ¶¶ 7-10; #57 ¶¶ 6-9; #66 ¶¶ 7-10; #67 p.1 ("Generally speaking, [Plaintiff] has no quarrel with [Defendant's] trademarks and its right to them.")). Thus, for the purpose of this opinion only, and without making any substantive finding thereof, the Marks are both protectable and are protected.

*Likelihood of causing confusion*

Regarding the second element, the likelihood of causing confusion, this Circuit normally applies a seven-factor test: "the degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and an intent on the part of the alleged infringer to palm off his products as those of another." *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167-68 (7th Cir. 1986).

In addition, a special presumption exists for licensees. "The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license." *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000). The rationale is that "a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983). *See also Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) ("Once a franchise has been terminated, the franchisee cannot be allowed to keep on using the trademark."); *The Shell Co. (Puerto Rico) Ltd. v. Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 22 (1st Cir. 2010) (holding that a gas station who had previously sold Shell-brand gasoline, but no longer so did was likely to confuse reasonably prudent consumers when it sold non-Shell brand fuel without completely obscuring the Shell trademarks); *Downtowner/Passport Int'l Hotel Corp. v. Norlew, Inc.*, 841 F.2d 214, 219 (8th Cir. 1988) (holding that a hotel was not permitted to use trademarked paraphernalia, such as credit card application forms, key rings, ash trays, and shoe shine clothes after its franchise from the company that issued those items had revoked its franchise); *Sunsport Inc. v. Barclay Leisure Ltd.*, 984 F. Supp. 418, 422 (E.D. Va. 1997) ("[A] former licensee who continues to use the

- 10 -

licensor's mark… has to overcome the presumption that it has infringed."). In fact, an ex-

franchisee's use of a mark is likely to be even more confusing. The Second Circuit has said that

> A licensee or franchisee who once possessed authorization to use the trademarks
> of its licensor or franchisor becomes associated in the public's mind with the
> trademark holder. When such party, as defendants here, loses its authorization yet
> continues to use the mark, the potential for consumer confusion is greater than in
> the case of a random infringer. Consumers have already associated some
> significant source identification with the licensor. In this way the use of a mark by
> a former licensee confuses and defrauds the public.

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d

Cir. 1986). This court agrees with the Second Circuit's reasoning.

In its Response, Plaintiff argues that it did not "use" Defendant's Marks because it was

unable to make any economic profit from it. Plaintiff argues that

> *Use* is one of those all-purpose words with half a page of definitions in any
> serious dictionary. If "use" is intended by O'Reilly in the sense of "utilize"
> which implies the putting of something to a practical or profitable use
> (*Webster's Dictionary*, New World Edition, 1964), the answer is that at no
> time did All Star do such a thing. The only practical use that All Star could
> ever have made of the name O'Reilly and its various trademarks was as a
> method of earning advertising revenue. Once it was no longer a revenue
> source it was no longer utilized by All Star; it was simply a useless word in a
> website that All Star was dilatory in cleaning. This is a distinction with a
> difference, the essence of which is that All Star freely admits that the various
> O'Reilly trademarks appeared in a number of places and even inappropriately
> in the sense that those appearances were against the express request of
> O'Reilly. All Star was not "using" or utilizing the marks in any sense of
> personal gain or advancement.

(#67 p. 2). In other places, Plaintiff argues that the Marks "inadvertently appeared… and to the

extent that the expression 'used' implies more than that inadvertent appearance," denies that it

"used" the marks. This position is unavailing. Plaintiff would like to add an additional element of

economic benefit to the alleged infringer or economic damage to the trademark holder where one

does not exist. The only three elements are, as discussed above, whether the mark is valid,

whether the use of the mark is likely to cause confusion, and whether the use was authorized. No

economic harm or disadvantage to the holder of the mark is required in order to sustain a trademark infringement claim. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275-76 (7th Cir. 1976). Similarly, Plaintiff argues that its continued display of Defendant's Marks in association with its own products constituted "free advertising", when Defendant would have paid Plaintiff for that privilege. By analogy to *Burrough*, a trademark infringement claim does not require economic benefit accrue to the alleged infringer, and thus, this argument also does not succeed.

Next, Plaintiff argues that "[t]here is no allegation that anyone mistook the All Star racing circuit for O'Reilly… There is nothing in the advertising that would cause someone to go to All Star to purchase auto parts, and the inadvertent appearance of the O'Reilly name after the termination of the relationship does not add to confusion of trademarks." (#67 p.5). This argument is also spurious. In an endorsement scheme, such as the one here, the "confusion" that arises when an ex-licensee continues to use a licensed trademark even though the license is revoked is not that a consumer will confuse the ex-licensee for the licensor *per se*, but rather, that the consumer will think that the licensor is continuing to *endorse* the licensee's product. The continuing (yet incorrect) illusion of an extant relationship between the two entities is the source of the confusion. A more apt analogy—one avoiding the concept of "sponsorship"—is if an individual marries into a celebrity family with a famous last name, changes his or her name to the famous one for the recognition benefit, but then is subsequently divorced. To continue to use the same famous last name is likely to cause confusion (although perhaps not illegal). The divorcee is not, in and of him or herself, confused with the *person* of the famous-last-name divorcer, as Plaintiff would argue, but rather, is continuing to reap the benefits of an *affiliation* with the famous last name when no such affiliation exists.

- 12 -

*Consent and authorization*

The third and final element is whether Plaintiff had consent, thereby giving it authorization to use the Marks. Defendant's Motion neglects to discuss this element, apparently because it assumed that it had withdrawn any consent when it did not renew the All Stars Circuit agreement for the 2010, 2011, and 2012 seasons. Or perhaps Defendant relied on using the Illinois Statute of Frauds offensively; by declaring the contract unenforceable through the affirmative defense, it assumed it had thereby voided the contract and the trademark license subsumed within it.[2]

However, in some circumstances, "the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license." *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) The United States Supreme Court stated that

> Any language used by the owner of the patent or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort.

---

[2] Notably, and without ruling on the substance of such a position because it is *obiter dictum* vis-à-vis the present ruling, the relevant Illinois Statute of Frauds reads, in pertinent part, as follows:

> No action shall be brought, whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made upon consideration of marriage, or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1. Read closely, the statute appears to only forbid an "action" to "answer for the debt" of another person.  It is not clear, and no caselaw could be found after a cursory search, regarding whether the contract is to be treated as void, or whether a plaintiff is merely barred from bringing an action. If only the latter, presumably preexisting terms of that contract could be used defensively. *See Curtis v. Hulburd*, 46 Ill. App. 419, 420 (Ill. App. Ct. 1892) ("The statute of frauds is not a sword but a shield.").

*De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927). *See also ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 940 (7th Cir. 2003) ("A copyright owner can grant a nonexclusive license "orally, or may even be implied from conduct…. In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing."); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 824 (3d Cir. 2006)("Although it appears that there is no express written license agreement between the parties, a trademark license can also be implied."); *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties.")

"A trademark license is typically written and contains express terms giving the licensor power to engage in quality control to ensure that the licensee does not engage in mere 'naked' use of the mark." *Doebler*, 442 F.3d at 823. "Naked licensing is an uncontrolled licensing of a mark whereby the licensee can place the mark on any quality or type of goods or services, raising a grave danger that the public will be deceived by such a usage." *Id*. (editing marks omitted.) The 2007, 2008, and 2009 Agreement not only does not include any restrictions on Plaintiff's use of the Marks, but does not even have any terms explicitly licensing or permitting the use of trademarks. (#57 exh. E). Instead, the agreement is replete only with Plaintiff's obligations to use the Marks. Thus, because the 2007, 2008, and 2009 Agreement had no express terms limiting the use of the Marks, or retaining the power to engage in quality control, this court cannot find that Defendant granted Plaintiff an express trademark license for that time period. Rather, the only possible conclusion is that Defendant must have intended to grant Plaintiff an implied naked

- 14 -

license. This conclusion is supported by Defendant's own attachment of an Additional Terms and Conditions rider in the 2010, 2011, and 2012 Agreement that, among other limitations, specifically revokes the license upon termination or expiration of the agreement. (#57 exh. G). That rider was not included in the 2007, 2008, and 2009 agreement. (#57 exh. E). Of course, it is Defendant who has argued that the 2010, 2011, and 2012 Agreement was not countersigned, and therefore, under the Statute of Frauds, is not binding. The self-evident severability of the licensing terms from the sponsorship agreement also suggests that the unenforceable written sponsorship contract is distinct from and independent from any implied license to use any of Defendant's Marks, and the termination of the sponsorship is neither a necessary nor sufficient condition for the termination of the implied trademark license. Further, the statute of frauds does not apply to an implied license because either party could have terminated the license within one year. *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1012 (N.D. Ill. 2000).

Accordingly, there remains a genuine issue of material fact as to whether Defendant granted Plaintiff an implied license to use the Marks and as to when such a license would have been terminated. Plaintiff admits that it did not have "specific" permission to use the Marks after December 31, 2010, but denies that it did not have consent to do so. (#26 ¶¶ 47, 51; #66 ¶¶ 47, 51). That admission, combined with the contested issue of whether Defendant supplied to Plaintiff promotional items to give away at the 2011 races, and whether Defendant approved all promotional and advertising actions taken by Plaintiff during the 2010 racing season up until November 2011, raises the question of whether an implied license was granted, thereby permitting Plaintiff to use the Marks for the 2010 and 2011 period.

The final question, then, is the point at which the implied license was actually terminated. While the license is valid, a licensor's use of the mark is not, without more, infringement; it is

only when the licensee no longer has consent that the continued use constitutes infringement.

Regarding the Midwest All Stars series, Plaintiff admits that the Title Sponsor Agreement for the

Midwest All Stars series expired at the end of 2010. (#57 exh. X ¶ 10; #27 ¶ 10). Plaintiff further

admits that it used the O'Reilly Mark and O'Reilly Auto Parts Mark in conjunction with

Midwest All Stars racing events between January 1, 2011, and July 15, 2011. (#57 exh. X, ¶¶ 12-

13; #27 ¶¶ 12-13). Regarding the All Star Late Model racing series, Plaintiff denies, strangely,

that it had specific permission to use the O'Reilly Auto Parts Marks for the 2009 and 2010 racing

season in conjunction with the All Star Late Model racing series. (#57 exh. X, ¶ 16; #27 ¶ 16).

Plaintiff further admits that it used the O'Reilly Mark and the O'Reilly Auto Parts Mark in

conjunction with the All Star Late Model racing series between January 1, 2011, and July 16,

2011. (#57 exh. X ¶¶ 17-18; #27 ¶¶ 17-18). Regarding the All Star Circuit of Champions events,

Plaintiff admits it used the O'Reilly Mark and the O'Reilly Auto Parts Mark between January 1,

2011, and July 15, 2011, (#57 exh. X ¶¶ 21-22; #27 ¶¶ 21-22), but denies that, in a meeting on

October 21, 2010, it was advised by Defendant that no agreement was in place beyond 2010 and

acknowledged as much, (#57 exh. X ¶¶ 27-29; #27 ¶¶ 27-29).

However, as discussed, an implied license to use the Marks must have been granted for

the 2007, 2008, and 2009 Agreement, and the ongoing validity of that agreement is disputed for

2010 and 2011. Critically, this court focuses on the disputed occurrence and characterization of

whether Defendant supplied to Plaintiff promotional items to give away at the 2011 races, and

whether Defendant approved all promotional and advertising actions taken by Plaintiff during the

2010 racing season up until November 2011. Therefore, because a genuine issue of material fact

exists, summary judgment may not be granted for Defendant's counterclaim regarding trademark

infringement for the contested portions of the 2010 season.

However, Plaintiff does affirmatively admit that it received a letter dated July 1, 2011 revoking authorization to use the Marks. Plaintiff also admits that on July 16, 2011, it posted a news article on its website stating that it "removed [Defendant] as the title sponsor" and that all of Defendant's "trademarked material have been removed from all logos, printed material, and social media from this date forward." (#57 exh. X ¶ 45 and #27 ¶ 45). This appears to be an implicit admission that authorization to use the Marks had been rescinded as of this date. But not only did this court note that as of September 29, 2011, Plaintiff still contained references to Defendant, (#22 p.3), the last date that Plaintiff admits it was using the Marks on its website was September 30, 2011. (#57 exh. X, ¶ 87; #27, ¶ 87).Therefore, it is clear that Plaintiff continued to use Defendant's Marks on its website after a date it concurs it should have stopped using the Marks. There is no dispute, then, that Plaintiff was a holdover licensee as of the earlier date that both parties agree that permission was revoked, which was July 16, 2011.

Accordingly, because it is not disputed that Plaintiff did not have a license to use the Marks between July 16, 2011 and September 30, 2011, and that it used Defendant's Marks in a way that was likely to cause confusion by operation of law, summary judgment is GRANTED for the trademark infringement counterclaim for the period between July 16, 2011 and September 30, 2011, for all the Marks, but DENIED for all other periods.

**Count 2: False Designation of Origin ("False Endorsement")**

Defendant asserts that Plaintiff has also violated 15 U.S.C. § 1125(a). That statute reads, as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

- 17 -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A clearer name for this claim is as the Seventh Circuit calls it—a "false endorsement". *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). False endorsement occurs when a person's identity is connected with a product or service in such a way that consumers are likely to be misled about that person's sponsorship or approval of the product or service. *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 880 (E.D. Wis. 2009), *aff'd,* 623 F.3d 436 (7th Cir. 2010), *citing ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915, 925–26 (6th Cir. 2003). The elements of a false endorsement claim under § 1125(a) are the same as a claim under § 1114: that (1) the defendants have a protectable trademark; and (2) a "likelihood of confusion" will exist as to the origin of the plaintiff's products. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999). *See also Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir. 1982) ("The elements of [§ 1114 and § 1125] causes of action are essentially similar, and the same set of facts will support a suit for either."). This conclusion is supported by the fact that both Plaintiff and Defendant rely on their § 1114 arguments and add little more. Of course, the endorsement or designation of origin could not logically be "false" if the endorsee had consent under an implied license. Accordingly, because this court has previously found that Plaintiff has engaged in trademark infringement for the period between July 16, 2011, and September 21, 2011, and because the two causes of action have substantially

similar elements, Defendant's motion for summary judgment is GRANTED for the false

endorsement counterclaim for the period between July 16, 2011, and September 30, 2011, but is

DENIED for all other periods.


**Use of Counterfeit Marks**

As a preliminary note, the use of a counterfeit mark in the context of the Lanham Act is

not, in and of itself, a cause of action. Rather, in a civil action arising under § 1114, a finding that

a counterfeit mark was used permits certain additional remedies, including seizure of the goods

so marked, § 1116(d)(1)(A); treble damages, § 1117(b); the awarding of statutory damages, §

1117(c); and attorney's fees, § 1117(a). It is for these special civil monetary remedies that

Defendant invokes the counterfeit mark provisions.

A "counterfeit mark" is defined as

> a counterfeit of a mark that is registered on the principal register in the United
> States Patent and Trademark Office for such goods or services sold, offered for
> sale, or distributed and that is in use, whether or not the person against whom
> relief is sought knew such mark was so registered;
>
> [ * * * ]
>
> but such term does not include any mark or designation used on or in connection
> with goods or services of which the manufacture[r] or producer was, at the time of
> the manufacture or production in question authorized to use the mark or
> designation for the type of goods or services so manufactured or produced, by the
> holder of the right to use such mark or designation.

15 U.S.C. § 1116(d)(1)(B). Thus, the elements of a counterfeit mark enhancement are: (1) a

spurious mark which is identical with, or substantially indistinguishable from, a registered mark,

15 U.S.C. § 1127; (2) that is registered with the U.S. Patent and Trademark Office's principal

register for use on the same goods or services for which the defendant uses the mark; and (3) the

defendant must not have been authorized to use the mark at the time the goods or services were

manufactured or produced. While the first two elements are self-explanatory, the third is aided

by some context. The third element's exception was intended to refer to overrun goods, which is

when a licensed manufacturer makes more products than are authorized under the provision of

the agreement. "If a licensee manufactures overruns during the course of a valid license, the

marks on those goods will remain noncounterfeit for purposes of this act, whatever changes may

later occur in the relationship between the trademark owner and the licensee. Thus, if goods are

manufactured during the course of a valid license, and sold after the termination of the license,

the marks of those goods remain noncounterfeit." Joint Congressional Statement on 1984

Trademark Counterfeiting Legislation, 130 Cong. Rec. H12079.

      The question of whether a holdover licensee's use of a formerly-licensed mark denoting a

sponsorship constitutes the use of "counterfeit mark" appears to be a matter of first impression in

this Circuit, and, perhaps, the Federal judiciary. This court holds that it does if and only if the

incident or product alleged to be infringing occurred or was manufactured after the alleged

infringer no longer had authorization to use the mark. This reasoning is based on an analysis of

the case law, a comparison of sponsorships with franchises, and the legislative history.


*Case law*

      There are surprisingly few cases dealing with this issue. It is usually fairly clear if a

product is a counterfeit: a manufacturer indicates that the product was not made to their

standards, *e.g.*, *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 589 (7th Cir. 2007),

*Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1147 (7th Cir.

1992); or that the producer was not authorized to use that mark on certain products it produced,

*e.g.*, *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 698 (7th Cir. 2009);

or it even appears that the counterfeit nature of the product is not contested, *e.g., Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 586 (7th Cir. 1989). It is less common to see cases in which the counterfeit mark provision is applied to a holdover licensee, and, as far as this court can find, none involving the endorsee of a sponsorship. Analogous cases are often about franchisees, which are fairly comparable because a franchise and a sponsorship both deal with a contractual delegation of the right to use intellectual property for a limited term, and both implicate the policy rationale of protecting the public consumer from a nonconforming product or service. Among those cases include a Sixth and Ninth Circuit decision split, and one case in our sister court at the Northern District of Indiana, relying on a Seventh Circuit case.

In *U.S. Structures, Inc. v. J.P. Structures, Inc.*, the Sixth Circuit ruled on a case involving a franchisee who had used the franchisor's trademarks in a deck construction business for a number of years without incident. 130 F.3d 1185, 1187 (6th Cir. 1997). When the franchisee stopped paying the required franchising fee, the franchisor terminated the agreement, but the defendant-franchisee continued to use the mark while it attempted to negotiate a settlement. *Id.* That court held that "§ 1117(b) does not apply where, as in this case, a holdover franchisee continues to use the franchisor's original trademark after the franchise has been terminated. Although the use of an original trademark is without authorization, it is not the use of a counterfeit mark." *Id.* at 1192. However, the opinion did not further elaborate how it came to that conclusion.

The Ninth Circuit came to the opposite answer in *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708 (9th Cir. 2005). There, an Idaho potato distributor licensed the state agency's certification marks for its potatoes. *Id.* at 711. After years of operation, the agency-licensor filed an action, alleging that the distributor-licensee had "breached

its licensing agreement and infringed [the agency's] certification marks by failing to keep adequate records and using unlicensed potato repackers." *Id*. at 712. The distributor argued that the use of the mark was not a counterfeit because it was in fact packing genuine Idaho potatoes, and thus, "the unauthorized sale of genuine goods does not constitute trademark infringement because it does not cause consumer confusion." *Id*. at 721. The Ninth Circuit disagreed and held that the use of the mark did constitute a counterfeit. The court reasoned that, among other things, it was not the nature of the product itself that was counterfeit, but rather the state agency's certification that the potatoes had been produced and distributed in accordance with its own quality control procedures that caused consumer confusion, and therefore, was counterfeit. *Id*. at 722.

The Seventh Circuit ruled on a related, but less analogous decision in *Gen. Elec. Co. v. Speicher*, 877 F.2d 531 (7th Cir. 1989). There, a subcontractor fabricated parts for a distributor, who was fulfilling a purchase order from a corporation. *Id*. at 532. The corporation required official parts from the original manufacturer, but the distributor did not acquire them from the manufacturer. Instead, the distributor passed the order through to the subcontractor, who was not authorized to fabricate those parts, and did not tell the corporation about the ultimate source. *Id*. at 533. The distributor provided boxes to the subcontractor stamped with the original manufacturer's trademark, which it was entitled to do because it was authorized to do by the manufacturer. *Id*. The Seventh Circuit held that the plaintiff was permitted to use the "counterfeit mark" enhancement because "the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute." *Id*. at 534. "The only function of a trademark is to designate a product or service, and the misconduct at which section 1114 is aimed consists not in making the

- 22 -

trademark without authorization but in affixing it to the wrong product; it is a detail whether the trademark was stolen from the manufacturer or merely copied." *Id*. at 535.

Finally, and most recently, in *Century 21 Real Estate, LLC v. Destiny Real Estate Properties*, a real estate agency entered into a franchise agreement with a national real estate brokerage franchise system. 4:11-CV-38 JD, 2011 WL 6736060 at *1 (N.D. Ind. Dec. 19, 2011) (unpublished). When the franchisee failed to make the required payments, the brokerage terminated the franchise agreement. *Id*. After the termination, the holdover franchisee continued to use the brokerage's marks, including on signs outside its offices and various websites identifying the franchise as being part of the system. *Id*. The Northern District of Indiana found the Sixth Circuit's reasoning in *U.S. Structures* less persuasive than those in *Idaho Potato* and *General Electric*. It could find "no reason why an ex-franchisee should escape liability for counterfeiting simply because that person had access to a franchisor's original marks because of the former relationship and therefore did not need to reproduce an identical or substantially similar mark." *Century 21*, 4:11-CV-38, 2011 WL 6736060, at *5. That court concluded that because "the purposes of avoiding public confusion and safeguarding the value of trademarks… underlie the enhanced liability for trademark counterfeiting," *Id*.

*Sponsorships vs. franchises*

Thus, if sponsorships are more like franchises, then it seems that a holdover endorsee should be treated as having used a counterfeit mark. Suppose a corporation sponsors a celebrity athlete, and that athlete competes with that corporation's logo augustly blazoned upon his person. Suppose then that the athlete engages in ethically or morally dubious (or otherwise politically incorrect) behavior. It would be certainly fair to say that when the corporation

terminates the sponsorship, the athlete's *display* of the now-unlicensed mark would be advertising all the wrong qualities. His display of the mark *on his person* would be likely to confuse a consumer into thinking that the corporation endorsed those deeds, thus reducing the value of the mark, and so the display might rightfully be called a "counterfeit".

However, if a sponsorship is more like having produced a product—that is, the tangible goods subsisting of the artifacts created out of the relationship, as well as the intangible benefit created from the increased exposure by advertising the brand during the pendency of the sponsorship—then perhaps the overrun exception in § 1116(d)(1)(B) could be applicable. A sponsorship is an arrangement in which "a person or an organization [] pays for or plans and carries out a project or activity; especially one that pays the cost of a radio or television program usually in return for advertising time during its course." Merriam-Webster Online, "Sponsorship: 3" http://www.merriam-webster.com/dictionary/sponsorship. A franchise is "the right or license granted to an individual or group to market a company's goods or services in a particular territory; *also*: a business granted such a right or license". Merriam-Webster Online, "Franchise: 2(c)(1)" http://www.merriam webster.com/dictionary/franchise.

There are two fundamental differences between sponsorships and franchises. First, the franchise provides value to consumers in the present tense—that is, people buy goods or services from the franchisee, relying on the ongoing use of the mark as an indicator of quality. The harm in a counterfeit mark is that consumers are confused by the holdover use of the mark when the franchisor no longer endorses the franchisee, but the franchisee continues to reap the benefits of the affiliation. But with a sponsorship, the value provided is advertising and awareness, the benefit being advertising seen by the public. At the moment the sponsorship is terminated, the value to the sponsor has already accrued. It is unlikely that an entity would continue to advertise

for its sponsor when it is no longer being paid to do so. If the exposure from the advertisement occurred while the use was authorized, the effect of the sponsorship was completed at the moment of exposure. That exposure, in and of itself, cannot be made "counterfeit" by a subsequent act. Any potential harm instead would come from a negative affiliation with the endorsee or the erroneous belief that the sponsor is continuing to sponsor the endorsee.

The second differentiating issue between a sponsorship and a franchise is the post-termination existence of collateral artifacts created during the pendency of the relationship. A franchise is an agreement permitting the marketing of goods or services; a sponsorship is an agreement to provide an advertising service that can often create additional objects that evidence a historical affiliation. The persistence of those artifacts is like the overrun situation. Suppose the previously-discussed sponsor creates a banner with the athlete standing in front of the corporation's headquarters with the corporation's logo visible. When the relationship is terminated, is there anything at all that could be said to be "counterfeit" about the corporation's logo in that banner—or, for that matter, photographs of the banner? Perhaps the athlete posts news articles about his prior sponsorships on his personal website. Trademark infringement, possibly; a violation of his sponsorship agreement, potentially; but counterfeit? Or suppose he places his likeness and signature on the corporation's product. Upon the termination of the sponsorship, if the athlete—or even a third-party retailer—sells one of those products, how could there be liability for *counterfeiting* the corporation's mark? All of those artifacts include, as the statute reads, a "mark or designation used on or in connection with goods or services of which the manufacture[r] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation." 15 U.S.C. § 1116(d)(1)(B).

- 25 -

Certainly, this is not to say that a franchise cannot produce co-branded artifacts. However, the issue of a counterfeit representation is rarely over the retrospective existence of those items, but rather, the services or products provided on a prospective basis. Compare this with the typical franchise use prohibited in the cases discussed above. In *Idaho Potato*, the holdover distributor's ongoing use of a certification mark was considered a counterfeit because the newly-produced potatoes sold to the public were not packaged according to standards. If the potatoes had been marked while the proper procedures were being followed, it makes no sense to say that the mark or the potatoes become counterfeit if the distributor later stops following the procedures. In *General Electric*, the holdover subcontractor's use of a genuine mark was considered a counterfeit because the trademark was affixed to the wrong product being sold to a consumer. Here, at least some portion of the "sale" or representation of affiliation occurred while the use of the Marks was still authorized. And in *Century 21*, the franchisee's use of the marks was treated as counterfeit because doing so would help avoid public confusion. *Century 21*, 4:11-CV-38, 2011 WL 6736060, at *5. It is dubious to suggest that consumers are likely to confuse an artifact created while the sponsorship existed for a current sponsorship, and besides, the policy implications of treating as counterfeit every product (or news article or photograph) cobranded by a disgraced celebrity is, to say the least, ridiculous.

*Legislative history on available remedies*

This conclusion does not leave the trademark holder with no recourse. Congress's 1984 Joint Statement specifically discussed the licensor's rights to control those items in the legislative history. The Statement noted that:

> The trademark owner has put the wheels in motion for the manufacturer to make the overruns, and has the means to protect himself or herself. For

> example, the trademark owner can specify in the contract that the making of overruns shall constitute a breach of contract, and that the manufacturer shall be liable for liquidated damages if overruns are made. The contract might also specify that the trademark owner has the right to inspect the manufacturer's facilities to ensure that overruns are not being made…. The contractual and other civil remedies already existing make it inappropriate to criminalize such practices.

Joint Congressional Statement on 1984 Trademark Counterfeiting Legislation, 130 Cong. Rec. H12079. Although not directly analogous to an overrun situation, the sponsor, as trademark owner, certainly has the means to protect itself. The contract may specify that the display of artifacts created or relating to events occurring before the termination of the contract must be taken down from public access, and those artifacts still in its possession destroyed. As it is now, Plaintiff would already be liable under a theory of trademark infringement and false endorsement, not to mention the state claims that have not yet been addressed (and which are coextensive to the Federal trademark claims). To add counterfeiting would be unnecessary. As Congress stated, "[t]he contractual and other civil remedies already existing make it inappropriate to criminalize such practices." 130 Cong. Rec. H12079.

Here, the 2007, 2008, and 2009 Agreement for the All Star Circuit of Champions does not have any provisions requiring Plaintiff to cease providing to the public any artifacts created during the pendency of the sponsorship. (#57 exh. E). In fact, there are no provisions regarding post-termination conduct. One would think that a corporation of Defendant's size would be able to draft an agreement that considers what happens afterward the sponsorship ends. In fact, it did—but only in the follow-up (and contested) 2010, 2011, and 2012 Agreement, as provided to this court. In an Additional Terms and Conditions rider, a provision requires that "[u]pon termination or expiration of this Agreement for any reason, all parties will immediately cease all use of the NAMES of the other parties as specifically granted in this Agreement." (#57 exh. G).

In its Motion for Summary Judgment, Defendant appears to confirm that these terms did not exist in the 2007, 2008, and 2009 agreement. (#57 ¶¶ 19-20). And, of course, Defendant itself is the party that wishes to render unenforceable the 2010, 2011, and 2012 Agreement.

Defendant's counterclaims list an undifferentiated amalgam of occasions and locations at which Plaintiff is alleged to have used Defendant's Marks in a counterfeit fashion. Three examples may be instructive. While Plaintiff does admit that it "[u]sed the O'Reilly Mark to promote the All Star Circuit of Champions by referring to that series as the 'O'Reilly All Star Circuit of Champions' on its website, as seen in the printout from All Star's website, printed on June 29, 2011", (#8 ¶ 46(a); #14 ¶ 46(a)), a closer examination of that document, (#57 exh. H), shows a list of news articles or press releases. Each one mentions the "O'Reilly Auto Parts All Star Circuit of Champions" along with a logo. Each of those articles dates from June 27, 2011, or earlier. As discussed earlier, this court cannot conclude from the evidence provided that the agreement was treated as terminated until July 16, 2011. Accordingly, summary judgment may not be granted on any of the trademark counterclaims from before that date.

Second, Defendant alleges, and Plaintiff does not contest, that news articles and photographs using Defendant's Marks appeared on Plaintiff's website on July 22, 2011. (#57 ¶ 62; #57 exh. Q). Here, the Marks were shown to the public after the uncontested termination date of July 16, 2011, so Defendant's motion for summary judgment on the trademark infringement claim may be granted. For example, an article on July 9, 2011 references the "O'Reilly All Star Circuit of Champions Sprint Car series event". Under today's holding, Defendant will not be permitted, as a matter of law, to apply the counterfeit mark enhancement provision to any alleged trademark infringement occurring before the date ultimately adjudged to be the termination date of the sponsorship, even if Plaintiff made them available to the public after that date. This is

because Plaintiff's use of the trademark before the termination date of the sponsorship would have been "authorized to use the mark… at the time of the manufacture". Therefore, the counterfeit mark enhancement may not be applied to the events described that occurred before July 16, 2011, which is the undisputed date for the termination of the implied license.

Last, Defendant alleges, and Plaintiff does not contest, that photographs and news articles remained on Plaintiff's website until August 24, 2011. (#57 ¶ 73; #57 exh. R). Exhibit R shows two articles with accompanying photographs using Defendant's Marks, dated July 31, 2011, and August 3, 2011. Because they occurred after July 26, 2011, summary judgment may be granted on the trademark infringement counterclaims. Furthermore, because the events themselves occurred after July 16, 2011, Plaintiff was not authorized to use the Marks for those events and for those articles, and accordingly, the counterfeit mark enhancement is applicable.


## Count 3: Illinois Uniform Deceptive Trade Practices Act

Defendant next claims that Plaintiff has violated the Illinois Deceptive Trade Practices Act. That statute states, in pertinent part, that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person…causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services. 815 ILCS 510/2(a)(2). "Under the Illinois Deceptive Trade Practices Act a defendant is liable only if the plaintiff can establish a likelihood of confusion between the parties' products." *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1173-74 (7th Cir. 1986). Because there is only one relevant element to the cause of action, it is not surprising that "proof of a trademark infringement is sufficient to establish a violation of the Illinois Uniform Deceptive Trade Practices Act." *Pirelli Armstrong Tire Corp. v. Titan Tire*

*Corp.*, 4 F. Supp. 2d 794, 799 (C.D. Ill. 1998); *see also Spex, Inc. v. Joy of Spex, Inc.*, 847 F.

Supp. 567, 579 (N.D. Ill. 1994) ("Claims for unfair competition and deceptive business practices

brought under Illinois statutes are to be resolved according to the principles set forth under the

Lanham Act."); *compare TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir.

1997) (the Seventh Circuit stating that "federal and state laws regarding trademarks and related

claims of unfair competition are substantially congruent.") *with Thompson v. Spring-Green Lawn

Care Corp.*, 466 N.E.2d 1004, 1010 (Ill. App. Ct. 1st Dist. 1984) (an Illinois state appellate court

stating that "[b]ecause the statutes themselves neither create a valid trademark or establish new

rights, courts apply a single analysis to federal, state, and common law claims. We may therefore

look to federal as well as to state case law in resolving the instant issues.") (citations omitted).

Because this opinion has already established that a presumption of a likelihood of confusion

exists, and has granted summary judgment on the trademark infringement counterclaim,

summary judgment is GRANTED on this cause of action for events occurring during the period

between July 16, 2011, and September 30, 2011 and DENIED as to all other periods.


**Count 4: Illinois Consumer Fraud and Deceptive Business Practices Act**

Defendant additionally claims that Plaintiff has violated the Illinois Consumer Fraud and

Deceptive Business Practices Act. The pertinent portion of that statute states that  "unfair

methods of competition and unfair or deceptive acts or practices, including but not limited to the

use or employment of any deception fraud, false pretense, false promise, misrepresentation or the

concealment, suppression or omission of any material fact, with intent that others rely upon the

concealment, suppression or omission of such material fact, or the use or employment of any

practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August

5, 1965, in the conduct of any trade or commerce are hereby declared unlawful." 815 ILCS
805/2. For the same reason that Defendant's Uniform Deceptive Trade Practices Act
counterclaim is coextensive with the trademark infringement counterclaim, so is its Consumer
Fraud and Deceptive Business Practices Act counterclaim. Accordingly, summary judgment is
GRANTED on this cause of action on the same terms as for Count 3.

**Count V: Defamation**

Under Illinois law, a defamatory statement is one "that harms a person's reputation to the
extent it lowers the person in the eyes of the community or deters the community from
associating with her or him." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). "To state a
defamation claim, a plaintiff must present facts showing that the defendant made a false
statement about the plaintiff, that the defendant made an unprivileged publication of that
statement to a third party, and that this publication caused damages." *Id*. Statements may be
considered defamatory *per se* or *per quod. Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206
(Ill. 1992). "Statements are considered defamatory *per se* when the defamatory character of the
statement is apparent on its face; that is, when the words used are so obviously and materially
harmful to the plaintiff that injury to his reputation may be presumed." *Id*.  If a statement is
defamatory *per se,* the plaintiff need not plead or prove actual damages to his reputation. *Seith v.
Chicago Sun-Times, Inc.*, 861 N.E.2d 1117, 1126 (Ill. Ct. App. 1st Dist. 2007). Statements are
considered defamatory *per quod* if the defamatory character of the statement is not apparent on
its face, and extrinsic facts are required to explain its defamatory meaning. *Kolegas*, 607 N.E.2d
at 206.  "Illinois law recognizes five categories of defamatory statements which are considered
actionable *per se:* (1) those imputing the commission of a criminal offense; (2) those imputing

infection with a loathsome communicable disease; (3) those imputing an inability to perform or

want of integrity in the discharge of duties of office or employment; (4) those that prejudice a

party, or impute a lack of ability in his or her trade, profession or business; and (5) those

imputing adultery or fornication." *Van Horne v. Muller*, 705 N.E.2d 898, 903 (Ill. 1998).

However, one who publishes a defamatory statement of fact is not subject to liability for

defamation if the statement is true. *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 675 (Ill.

App. Ct. 1st Div. 2000). Only "substantial truth" is required for the defense. *Id.* "Substantial

truth refers to the fact that a defendant need prove only the 'gist' or the 'sting' of the statement."

*Moore v. People for the Ethical Treatment of Animals, Inc.*, 932 N.E.2d 448, 457 (Ill. Ct. App.

1st Dist. 2010). "While determining 'substantial truth' is normally a question for the jury, the

question is one of law where no reasonable jury could find that substantial truth had not been

established." *Id.*; *see also Harrison v. Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 767 (Ill. App.

Ct. 1st Dist. 2003) ("The substantial truth of a statement is normally a jury question, but where

no reasonable jury could find that substantial truth had not been established, the question is one

of law.").

Further, this court is required to evaluate defamation actions using the innocent

construction rule. "Even if a statement falls into one of the recognized categories of words that

are actionable *per se,* it will not be found actionable *per se* if it is reasonably capable of an

innocent construction." *Bryson v. News Am. Publications, Inc.*, 672 N.E.2d 1207, 1215 (Ill.

1996). "The innocent construction rule requires courts to consider a written or oral statement in

context, giving the words, and their implications, their natural and obvious meaning." *Id.* "If, so

construed, a statement may reasonably be innocently interpreted or reasonably be interpreted as

referring to someone other than the plaintiff, it cannot be actionable *per se.*" *Id.* (editing marks

omitted). "The rigorous standard of the modified innocent construction rule favors defendants in *per se* actions in that a nondefamatory interpretation must be adopted *if* it is *reasonable.* The tougher standard is warranted because of the presumption of damages in *per se* actions." *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1302 (Ill. 1996). "In Illinois courts, this determination is made by the judge and it is regarded as a question of law." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003).

Here, Defendant claims there are three instances of defamatory statements in the July 16, 2011 publication that qualify as "those imputing an inability to perform or want of integrity in the discharge of duties of office or employment" or "those that prejudice a party, or impute a lack of ability in his or her trade, profession or business." Plaintiff's statement is repeated here for convenience:

> *All Star Championship Racing, Inc. ends relationship with O'Reilly Auto Parts*
> Camargo, IL (7-16-11) - All Star Championship Racing, Inc. has removed O'Reilly Auto Parts as the title sponsor for the All Star Circuit of Champions, All Star Late Model Series, and the Midwest All Star Series resulting from an unpaid invoice in January 2011, we are now moving forward with collection proceedings. Please note that all O'Reilly trademarked material have been removed from all logos, printed material, and social media from this date forward. We have enjoyed several years in working with O'Reilly Auto Parts in sponsoring our company, it is regretful the relationship has ended.

(#57 exh. X ¶ 45; #27 ¶ 45). Defendant argues that those statements are defamatory *per se* because they incorrectly state or imply that:

> O'Reilly fails to honor its contractual obligations; O'Reilly fails to pay proper invoices, resulting in "unpaid invoices;" and O'Reilly's "unpaid invoices" result in the necessity for "collection proceedings" against O'Reilly, thereby: assailing O'Reilly's financial or business methods; accusing O'Reilly of mismanagement; imputing that O'Reilly is unable to perform its business duties; imputing that O'Reilly lacks integrity in performing its business duties; imputing that O'Reilly lacks ability in its profession; and otherwise prejudicing O'Reilly in its profession.

(#26 ¶ 84).

First, Defendant argues that the term "unpaid invoice" was a *per se* defamatory statement. Because that statement "imputes a lack of ability in his or her trade, profession or business", Plaintiff's only defense would be that there was substantial truth in the matter. Defendant asserts that Plaintiff's Amended Complaint does not even claim that there was an express agreement, and because the only recovery would be in quasi-contract, that there could not possibly have been an "invoice", much less an "unpaid" one. This court disagrees. The "gist" or "sting" of an "unpaid invoice" is merely that Defendant owes Plaintiff money. Plaintiff has claimed at least that much. In the Amended Complaint, Plaintiff claims that Defendant had given it a contract, which Plaintiff signed and returned on January 6, 2010, and that by November 2010, which is when Plaintiff asserts Defendant refused to pay for the 2011 season, it had already done much of the preparatory work for the 2011 season, and in reliance on prior dealings and on being supplied promotional items for the 2011 races and having approved all promotional and advertising actions through November 2011. (#56 ¶¶ 7-15). Defendant denies those allegations. (#70 ¶¶ 7-15). The legal procedures underlying how Plaintiff might or might not be compensated are details. A reasonable jury could find that a contract had been implied, or that Plaintiff was entitled to recover in quasi-contract, and that the term "unpaid invoice" could refer to the expectation of payment for services previously rendered.

Second, Defendant argues that the phrase "moving forward with collection proceedings" was defamatory *per se* because the statement "imputes a lack of ability in his or her trade, profession or business". Defendant asserts that the statement is false because on November 1, 2011, Judge Bernthal ruled that Plaintiff's claim should be dismissed with prejudice, and that the only proceedings active at that point were Defendant's counterclaims. This court also disagrees. Pursuant to Local Rule 72.2, "[a]ny party may object to a magistrate judge's report and

recommendation by filing an objection in accordance with Fed. R. Civ. P. 72(b) within 14 days after service thereof." And of course, as happened in this case, Plaintiff was given leave to file an amended complaint, which it did do. Proceedings were, and in fact, still are, continuing. Further, the gist of that phrase is that a dispute exists regarding the expectation of payment on services that have not yet been paid. A reasonable jury could find that Plaintiff merely said that "I think Defendant owes me money and I'm going to pursue it in court." If Plaintiff had instead said that "A court said Defendant owes me money", then that statement would be facially false.

Third, Defendant argues that "[it] was also clear at the time the posting was made that Plaintiff had *not* removed all O'Reilly trademarked material from its web pages." This court does not understand how this statement is defamatory. False, perhaps. Defamatory, no.

This court has reviewed the statements that Defendant has alleged to be defamatory and, for the reasons above, have found that they afford an innocent construction. This court concludes that Defendant failed to establish defamation *per se*. Its claim is better construed as defamation *per quod*; it is free to prove actual damage to its reputation and pecuniary loss resulting from the defamatory statement in order to recover. *See Bryson*, 672 N.E.2d at 1129. Accordingly, Defendant's Motion for Summary Judgment is DENIED as to the defamation claim.

IT IS THEREFORE ORDERED THAT:

(1) The Motion for Summary Judgment (#57) is GRANTED in part and DENIED in part, as enumerated in the opinion, as to Counts 1, 2, 3, and 4; and DENIED in whole as to Count 5.

(2) This case is REFERRED to Magistrate Judge David G. Bernthal for court-hosted mediation. Further, the parties are directed to contact Judge Bernthal's chambers to schedule a settlement conference.

ENTERED this 18th day of April, 2013

**s/ Michael P. McCuskey**

MICHAEL P. McCUSKEY
U. S. DISTRICT JUDGE